UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) | |
| v. | ) ) | No. 23-cr-55-LM |
| STEPHANIE PRATT, | ) ) | |
| Defendant. | ) ) ) | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The defendant stole almost a half million dollars from Company 1,[1] a small business located in Hinsdale, New Hampshire. She used the siphoned funds to live well above her means, including squandering over $5,600 of the victim's money for tickets to Tom Brady's return game at Gillette Stadium in October 2021. She started stealing almost immediately after she started working at the victim company in June 2015. That was just one year after she was convicted of embezzling about $10,000 from her prior employer. She took advantage of the trust placed in her by John Doe, the victim's then-elderly owner. The defendant had multiple opportunities to come clean when Company 1's management and law enforcement asked about the missing money. She instead repeatedly lied to cover her tracks. And when the fraud was uncovered, the defendant had the gall to demand Doe's widow pay her a Christmas bonus. Under the circumstances, the Government requests the Court impose a Guidelines sentence of 30 months of imprisonment. The Government further requests the Court impose three years of supervised release, which will help facilitate payment on the defendant's substantial restitution obligation.

I.    **Factual Background**

---

[1] The names of the victim company and affected individuals are anonymized to protect their identities.

The defendant started working for Company 1 in June 2015.  PSR ¶ 8; ECF No. 22 (Plea) at 2.  She was the office manager and had signatory authority over the company's finances.  PSR ¶ 8.  Doe owned Company 1 but died in October 2021, shortly before the fraud was unraveled.  PSR ¶ 10.  Company 1 has been in Doe's family for several generations and is currently based in Hinsdale, New Hampshire.  PSR ¶ 10.

A FBI forensic accountant reviewed Company 1 and the defendant's financial records and determined she stole $492,325.34.  PSR ¶ 33.  The defendant stole the money through two principle means.  First, she abused her check-writing authority to draft hundreds of unauthorized checks payable to herself over the course of six years.  PSR ¶ 36.  The defendant doctored the company's accounting records and bank statements to show that the checks were legitimate payments to vendors.  PSR ¶ 36.  For example, on July 1, 2015, she drafted a check for $614 payable to herself, but altered the bank statement to show that the payment was to a vendor.  PSR ¶ 36.  Similarly, on May 24, 2017, she drafted a check for $1,425 payable to herself, but altered the bank statement to show that the payment was to another vendor.  PSR ¶ 36.  Overall, she stole $349,568.72 from the fraudulent checks alone.  PSR ¶ 37.

Second, the defendant misused the company's credit cards.  There were two credit cards in question.  The first, ending -3197, was active from when the defendant was hired in 2015 through the January 15, 2020 billing cycle.  PSR ¶ 39.  The second, ending -0013, was active from the February 15, 2020 billing cycle onwards.  PSR ¶ 39.  The defendant made over 1,000 unauthorized purchases using these credit cards.  Plea at 3.  The fraudulent purchases totaled $142,756.62.  PSR ¶ 41.  They included Geico insurance premiums for the defendant's personal vehicles, four tickets costing over $5,600 for the October 2021 Patriots-Buccaneers game (which was Tom Brady's return to Gillette Stadium after leaving the Patriots), Amazon purchases

totaling over $50,000 for items like a smart TV, electronics, and hot tub, and miscellaneous cooking items, herbs, and spices from a multi-level marketing company called Pampered Chef. PSR ¶ 40.

Jane Roe, Doe's widow, is a co-owner of Company 1. PSR ¶ 11. Roe told law enforcement that Company 1 suffered cash shortfalls during the years the defendant worked there, resulting in the company taking out multiple lines of credit. PSR ¶ 11. The money problems eased up after the defendant was fired for embezzlement. PSR ¶ 11. After Doe's death, Roe confronted the defendant about the missing money. PSR ¶ 13. The defendant attempted to deceive Roe by providing doctored credit card statements omitting the fraudulent purchases. PSR ¶ 13. When asked about the missing entries, the defendant claimed that she had spaced out the lines to make the statements easier to read. PSR ¶ 13. Roe asked the defendant about the fraudulent credit card expenses. PSR ¶ 14. The defendant told Roe that she had merely accidentally clicked on the wrong button when making personal purchases—even though there were more than 1,000 such purchases. PSR ¶ 14. The defendant also told Roe she did not want the police to be involved and claimed she would pay the money back, though she never did. PSR ¶ 14. Roe fired the defendant, and in response the defendant demanded a Christmas bonus. PSR ¶ 14.

A manager at Company 1 reported that he noticed suspicious transactions began soon after the defendant was hired in 2015. PSR ¶ 15. The manager said that the defendant tried shifting the blame onto him but noted that the fraudulent expenses were tied directly to the defendant herself. PSR ¶ 16. The manager also stated that some of Company 1's customers had paid their bills in cash, but that the cash was undocumented in the company's financial records. PSR ¶ 17.

On June 9, 2022, the FBI conducted an initial voluntary, non-custodial interview of the defendant. PSR ¶ 19. She denied stealing money from the company and writing checks to herself. PSR ¶ 19. She then backtracked and admitted to writing checks to herself, but falsely claimed that she did so at Doe's direction. PSR ¶ 19. She stated that Doe asked her to cash the checks and give the money back to him. PSR ¶ 19. She claimed that Doe was using the cash to give to his son, and that this activity occurred during the entire time she worked at Company 1. PSR ¶ 19. However, Doe's son died in 2018, and the defendant continued to write checks payable to herself for another three years afterwards. The FBI interviewed the son's partner, who said that the son was financially independent. PSR ¶ 18. While Doe covered some of his son's expenses, Doe never used the defendant or any other Company 1 employee as an intermediary. PSR ¶ 18. Roe corroborated this information. PSR ¶ 12. During the initial interview, the defendant also falsely claimed that Doe let her use the company credit card for personal expenses. PSR ¶ 21. She only admitted to accidentally using the company cards to pay for about $600 worth of food from DoorDash. PSR ¶ 22.

A week later, the FBI conducted a second voluntary, non-custodial interview. PSR ¶ 24. The defendant falsely alleged that a Company 1 manager was making unauthorized personal purchases using the company credit cards. PSR ¶ 24. She admitted to doctoring the company's credit card statements, but falsely claimed that she did so at Doe's request because he wanted the accounting records to stay a secret and hide the truth from his wife and other company staff. PSR ¶ 24. She also claimed that Doe approved her purchases, including the $5,600 spent on tickets for the October 2021 Patriots-Buccaneers game (which occurred less than a week before Doe's death). PSR ¶ 24. She further claimed that Doe had allowed her to use the company gas card for personal reasons, including snowmobiling in Pittsburgh, New Hampshire. PSR ¶ 26.

As mentioned earlier, during the first interview the defendant claimed that between 2015 and 2021 Doe had directed her to cash many checks so that the funds could be used to support Doe's son. However, Doe's son passed away in 2018, well before many of the fraudulent transactions. PSR ¶ 25. When confronted with that fact, the defendant backtracked and said that the cash payments only occurred until 2018. PSR ¶ 25. The defendant also falsely asserted that some of the payments were off-the-books compensation approved by Doe. PSR ¶ 27.

The defendant agreed to a third voluntary, non-custodial interview on September 15, 2022. PSR ¶ 28. She claimed that she legitimately earned her income through several means, including working at a waitress at "Waxy's" in Keene, and selling Pampered Chef goods. PSR ¶ 28. However, the bar Waxy O'Connor's closed several years ago. PSR ¶ 9. When asked why she received payments from Company 1 well in excess of her authorized pay, the defendant claimed that it was compensation for her "reading blueprints." PSR ¶ 29. She later backtracked and acknowledged that she did not do much "blueprint" work. PSR ¶ 29. The defendant admitted to altering the company's credit card statements but claimed that Doe asked her to doctor the records to conceal the real finances from other management. PSR ¶ 30. Eventually, the FBI confronted the defendant on her everchanging stories, and the interview was effectively over. PSR ¶ 32.

## II.    Guidelines Calculation

The parties agree with Probation that the Guidelines range in this case is 30-37 months. In reaching this conclusion, Probation applied a 12-level loss enhancement because the loss amount was between $250,000 and $550,000. PSR ¶ 49. An additional two-level enhancement applied because the defendant abused her position of trust. PSR ¶ 51.

## III.    Argument

The sentencing statute, 18 U.S.C. § 3553, sets forth the factors district courts must consider in imposing a just sentence. Those factors include "the nature and circumstances of the offense," "the history and characteristics of the defendant," "the need to avoid unwarranted sentence disparities among defendants," and the "need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law," and "to afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(1), (2), & (6).

**A.      Nature and Circumstances of the Offense**

As established in the PSR, the defendant's capacity for mendacity is astounding. For almost a decade, she engaged in a constant game of lies and deception. She abused the trust an elderly man placed in her and siphoned off a half million dollars from a small business. Because of the defendant's crime, the victim company suffered financial difficulties and had to take out lines of credit. That itself warrants a significant term of imprisonment. But the defendant compounded that wrongfulness with the myriad of falsehoods she told. Among the many lies are:

- Claiming that Doe told her to draft checks payable to herself and give him cash as part of a convoluted scheme to support Doe's son (who unbeknownst to the defendant was deceased) (PSR ¶ 19);

- Claiming that Doe allowed her to use company credit cards for personal purchases (PSR ¶ 21);

- Trying to pin the embezzlement on another Company 1 employee (PSR ¶ 24);

- Claiming that Doe had her doctor the financial records so that the truth would stay a "secret" between her and Doe (PSR ¶ 24);

- Claiming that Doe let her use the company gas card to go snowmobiling (PSR ¶ 26);

- Suggesting that the stolen funds were attributable in part to her work for the bar Waxy's in Keene, which closed almost seven years ago (PSR ¶ 28);

- Claiming that the stolen funds were attributable in part to her "reading blueprints" (PSR ¶ 29);

- Telling Roe that the missing entries in the doctored credit card statements were intentional gaps to make them easier to read (PSR ¶ 13); and

- Claiming that the unauthorized credit card purchases were simply her "accidentally" clicking the wrong button (despite there being over 1,000 such "accidents") (PSR ¶ 14).

Each time the defendant was confronted with evidence undercutting a previous lie, she concocted a new fable (such as when she learned that she could no longer claim the stolen money was going to fund an elderly man's already dead son). And to top it all off, when she was finally caught by Doe's widow, the defendant had the shamelessness to demand a Christmas bonus. PSR ¶ 14 All of this totally undermines any present claim of remorse. Her misconduct was nothing less than selfishness on the highest order with little regard for the financial havoc she wreaked. And the evidence shows that the money all funded a lifestyle of luxury she could not afford, ranging from plane tickets to football tickets. This malfeasance supports an inference that the defendant is a compulsive liar.

During sentencing, the Court will hear from a representative of Company 1 and how the defendant's crime adversely affected the organization. It suffices to say for now that the defendant's crime was devastating. As noted above, the victim suffered cash shortages and had to take out lines of credit. And the victim lost multiple accounts with suppliers because the defendant stole money that was supposed to pay those suppliers. PSR ¶ 44. It has taken years for Company 1 to dig out of the hole the defendant dug. While the intangible effects of this

crime are not compensable under the law, they are part and parcel of the factors the Court should consider in imposing sentence.

**B.      History and Characteristics of the Defendant**

One important aggravating factor that stands out is the defendant's prior embezzlement conviction.  In late 2012, the defendant was working as an office manager for a Keene rental company.  PSR ¶ 62.  Several tenants, all of whom were students, paid cash to the defendant but the company's records did not reflect any cash payments.  PSR ¶ 62.  Therefore, the rental records showed the students were delinquent on their payments.  PSR ¶ 62.  In reality, the defendant had pocketed thousands of dollars for herself.  PSR ¶ 62.  When confronted about the missing money, she lied and claimed that someone else stole the money from her at a Cumberland Farms.  PSR ¶ 62.  Moreover, to cover up her crime, the defendant fabricated financial records and receipts.  PSR ¶ 62.  This pattern—ranging from doctoring documents to lying and attempting to pin blame on others—is alarmingly similar to what happened here.

The defendant pled guilty to the prior embezzlement and was sentenced in May 2014 to 12 months in the House of Corrections and two years' probation.  PSR ¶ 62.  Shortly after her release (and while on probation) she started stealing from Company 1, showing she learned nothing from her prior conviction.  Only this time, the theft was magnitudes worse: about 50 times larger.  This recidivism undercuts a downward variance argument and suggests that nothing less than 30 months, the bottom of the Guidelines range, is appropriate.

**C.      The Need for Deterrence and to Promote Respect for the Law**

When drafting the sentencing statute, Congress specifically noted that general deterrence is particularly important for white-collar criminals.  Specifically, Congress stated "Major white collar criminals often are sentenced to small fines and little or no imprisonment.  Unfortunately,

this creates the impression that certain offenses" are punished so lightly that the consequences "can be written off as a cost of doing business." S. Rep. No. 98-225, at 76 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3259.

This is a serious white-collar offense and demands a commensurate sentence. Here, the defendant stole almost a half-million dollars from a small business, an amount that falls near the upper-end of the relevant loss bracket of $250,000 to $550,000. U.S.S.G. § 2B1.1(b)(1)(G). She siphoned off the funds over the course of six-and-a-half years and carefully took steps to conceal her fraud by doctoring financial records. And when caught, she came up with a cascade of lies to deceive her victim, including trying to pin the embezzlement on an innocent party and claiming that she directed the money to Doe's dead son. A probationary sentence is plainly inappropriate given the breadth and scope of the defendant's crime. A sentence of 30 months, which is at the bottom of the applicable Guidelines range, is the bare minimum to not only deter prospective wrongdoers, but also promote public confidence that the justice system will adequately punish fraudsters like the defendant.

## IV.    Conclusion

For the foregoing reasons, the Government respectfully requests the Court impose a sentence of 30 months and three years of supervised release.

Respectfully submitted,

JANE E. YOUNG
United States Attorney

Dated: November 4, 2024          By:    /s/ Alexander S. Chen
                                          Alexander S. Chen
                                          Assistant U.S. Attorney
                                          53 Pleasant Street, 4th Floor
                                          Concord, New Hampshire 03301
                                          (603) 225-1552
                                          Alexander.chen@usdoj.gov